[Crim. No. 13648. In Bank. Oct. 1, 1970.]

In re THEODORE WILLIAM COX on Habeas Corpus.

## COUNSEL

Stanley J. Friedman, Herzstein, Maier & Carey, Herzstein, Maier, Carey & Friedman and Paul N. Halvonik for Petitioner.

David Menary, Jr., City Attorney, Richard T. Tarrant, Assistant City Attorney, Douglas J. Maloney, County Counsel, and George J. Silvestri, Jr., Deputy County Counsel, for Respondent.

## Opinion

**TOBRINER, J.**—Theodore William Cox petitions for a writ of habeas corpus. Petitioner was arrested at the Northgate Shopping Center in San Rafael and charged with violation of section 8.12.210 of the San Rafael Municipal Code, for remaining upon "business premises after being notified by the person in charge thereof to remove therefrom."

The primary issue raised by petitioner is that the San Rafael ordinance does not bestow upon the shopping center an absolute power arbitrarily to eject him, a would-be customer, from its premises. Explaining that the ordinance incorporates the provisions of the Unruh Civil Rights Act, we hold, as a matter of law, that the act does not sanction any such arbitrary exclusion of a customer, although the center may, of course, establish reasonable regulations for its operation. Second, petitioner urges that the state law has preempted the subject matter of the San Rafael ordinance; we do not agree. Nor do we concur in petitioner's next contention that the ordinance, properly construed, fails because of its vagueness. Finally, petitioner submits that the center violated his rights under the First Amendment, but, although we set forth certain constitutional protections to which he is entitled, we cannot, in the absence of a finding of the facts, determine whether his particular conduct merited any such protection. Hence, we conclude that the writ must be denied, and the order to show cause discharged.

### 1. *The facts*

We set forth the substantial facts as disclosed by the allegations of the parties.[1] In the afternoon of May 21, 1968, petitioner entered the North-

---

[1] In his memorandum of points and authorities in support of his demurrer in the municipal court, petitioner stated most of the important facts relevant to this case. The prosecution, in its opening brief before the appellate division of the superior court, admitted: "Defendant Cox has substantially set forth the facts in his Memorandum of Points and Authorities filed in the Municipal Court." In his petition for habeas corpus in this court petitioner repeated precisely the same statement of facts as that which he had presented to the municipal court. On the basis of those submitted facts and the prosecution's admission of their substantial truth in the superior court we granted an order to show cause. In its return to that order before this court, however, the prosecution denied "each and every, all and singular, of the allegations contained in" petitioner's statement of the facts of the case. The prosecution then proceeded to set forth numerous allegations concerning the activities of petitioner's friend, one Mark J. Lee, who was arrested at the same time as petitioner, but who is not before this court. The prosecution did not, however, state any factual allegations which contradict in any material form petitioner's statement of facts.

As in *In re Berry* (1968) 68 Cal.2d 137, 141 and fn. 2 [65 Cal.Rptr. 273, 436 P.2d 273], we find that all of the indicated material is properly before us in this proceeding, and we have relied directly upon that material in reviewing this case. "To the limited

gate Shopping Center in San Rafael, Californa, intending to make a purchase. Upon arrival he saw a friend standing on the sidewalk of the shopping center. Petitioner, on a Honda motorcycle belonging to his father, pulled up to the curb and proceeded to talk with this young man, who wore long hair and dressed in an unconventional manner.

Shortly after the beginning of the conversation, a security officer approached and ordered both youths to leave the premises. Informing the guard that he intended to make a purchase, petitioner went to park the motorcycle. After doing so, petitioner rejoined his friend and together they were about to undertake the purchase when the guard again ordered them to leave. A discussion ensued regarding the guard's legal authority to eject them without giving any reason for it. Others at the shopping center joined in the debate, which petitioner described as "heated." In the course of the discussion, petitioner did purchase a Coca Cola and sat on a communal bench provided by the shopping center for patrons of the soft drink concession. The police arrived and arrested petitioner and his friend.

Approximately 20 days after the above incident, the District Attorney of Marin County filed a complaint in the Municipal Court of the Central Judicial District of Marin County, charging petitioner with a "misdemeanor, to-wit: violation of Section 8.12.210[2] of the San Rafael Municipal Code

---

extent that issues of fact have been raised, we consider their resolution irrelevant to a determination of the legal issues here involved. . . ." (*In re Berry, supra,* 68 Cal.2d 137, 141, fn. 2; cf. *In re Smith* (1904) 143 Cal. 368, 370-371 [77 P. 180].)

[2] "Section 8.12.210. Trespasses Upon Private Property Prohibited. (a) No person shall remain upon any private property or business premises, after being notified by the owner or lessee or other person in charge thereof to remove therefrom. (b) No person, without permission, express or implied, of the owner or lessee or other person in charge of private property or business premises, shall enter upon such private property or business premises after having been notified by the owner or lessee or other person in charge thereof to keep off or keep away therefrom. (c) *Exceptions.* This section shall not apply in any of the following instances: (1) Where its application results in or is coupled with an act prohibited by the Unruh Civil Rights Act or any other provision of law relating to prohibited discrimination against any person on account of color, race, religion, creed, ancestry or national origin; (2) Where its application results in or is coupled with an act prohibited by Section 365 of the California Penal Code or any other provision of law relating to duties of innkeepers and common carriers; (3) Where its application would result in an interference with or inhibition of peaceful labor picketing or other lawful labor activities; (4) Where its application would result in an interference with or inhibition of any other exercise of a constitutionally protected right of freedom of speech such as (but not limited to) peaceful expressions of political or religious opinions, not involving offensive personal conduct; or (5) Where the person who is upon another's private property or business premises is there under claim or color of legal right. This exception is applicable (but not limited to) the following types of situations involving disputes wherein the participants have available to them practical and effective civil remedies: marital and post-marital disputes; child custody or visitation

in that said Defendants did then and there remain upon private property and business premises after being notified by the person in charge thereof to remove therefrom." ■ (See fn. 3) Having been admitted to bail in the amount of $65, petitioner is in constructive custody awaiting trial on the above described charges.[3]

2. *The San Rafael trespass ordinance does not endow the shopping center with an absolute power arbitrarily to exclude a would-be customer from its premises.*

This case presents conflicting interpretations of the ordinance: the shopping center claims the absolute power to exclude petitioner and any other person whom it does not wish to serve; petitioner maintains that the center cannot arbitrarily eject him from its premises. Since the ordinance interlocks with the Unruh Act,[4] its proper interpretation involves not only the municipal legislation, and the comparatively narrow circle of persons in the locality which it affects, but the California enactment and the far broader statewide concentric circle of people that it involves. Thus the questions raised and briefed are surely important ones that we should now resolve for the guidance of the trial court in subsequent proceedings in this litigation. (See *Brandt* v. *Superior Court* (1967) 67 Cal.2d 437, 444 [62 Cal.Rptr. 429, 432 P.2d 31]; *Shively* v. *Stewart* (1966) 65 Cal.2d 475, 481 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 1431].)

The ordinance ties into the Unruh Act by providing that it shall not be effective in an instance in which "its application results in or is coupled

disputes; disputes regarding title to or rights in real property; landlord-tenant disputes; disputes between members of the same family or between persons residing upon the property concerned up until the time of the dispute; employer-employee disputes; business-type disputes such as those between partners; debtor-creditor disputes; and instances wherein the person claims rights to be present pursuant to order, decree or process of a court. . . ."

[3]Habeas corpus will, of course, lie to test the restraint imposed on a defendant by the constructive custody of bail awaiting trial. (*In re Berry, supra,* 68 Cal.2d 137, 145-146 (bail); *In re Hubbard* (1964) 62 Cal.2d 119, 121 [41 Cal.Rptr. 393, 396 P.2d 809] (bail); *In re Petersen* (1958) 51 Cal.2d 177, 181-182 [331 P.2d 24, 77 A.L.R.2d 1291] (bail); see *In re Smiley* (1967) 66 Cal.2d 606, 611-614 [58 Cal.Rptr. 579, 427 P.2d 179] (own recognizance); *In re Allen* (1962) 59 Cal.2d 5, 6 [27 Cal.Rptr. 168, 377 P.2d 280, 97 A.L.R.2d 1415]; *In re Deane* (1937) 8 Cal.2d 599, 600 [67 P.2d 333] (bail).)

[4]The first section of the Unruh Civil Rights Act, Civil Code section 51, states: "All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national orgin. are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." References hereinafter to section 51, without mention of any code, are to the quoted section.

with an act prohibited by the Unruh Civil Rights Act. . . ."[5] As we shall explain, that statute, although primarily invoked in recent years to prohibit racial discrimination, does not limit itself to racial discriminaton; both its history and its language disclose a clear and large design to interdict all arbitrary discrimination by a business enterprise. That the act specifies particular kinds of discrimination—color, race, religion, ancestry, and national origin—serves as illustrative, rather than restrictive, indicia of the type of conduct condemned. We shall likewise explain, however, that this broad interdiction of the act is not absolute; the center may establish reasonable regulations that are rationally related to the services performed and facilities provided.

The early common law decisions regarded certain enterprises as "public" or "common" callings, or, to use a later phrase, "affected with a public interest." These undertakings "held themselves out" as providing a particular product or service to the community. (Arterburn, *The Origin and First Test of Public Callings* (1927) 75 U.Pa.L.Rev. 411, 418-428; Hamilton, *Affectation with Public Interest* (1930) 39 Yale L.J. 1089, 1098-1099; see *Civil Rights Cases* (1883) 109 U.S. 3, 26, 37-42 (dissenting opinion of Harlan, J.); *Klim* v. *Jones* (N.D. Cal. 1970) 315 F. Supp. 109, 118-120 (Levin, J.).) The common law attached to these enterprises "certain obligations, including — at various stages of doctrinal development — the duty to serve all customers on reasonable terms without discrimination and the duty to provide the kind of product or service reasonably to be expected from their economic role. Such occupations as blacksmith, food seller, veterinarian, and tailor, as well as those of common carrier and innkeeper were probably included in that category." (Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1250 (fns. omitted); see J. Story, Commentaries on the Law of Bailments (9th ed. 1878) § 508 at p. 483; cf. *Bell* v. *Maryland* (1964) 378 U.S. 226, 286, 296-304 [12 L.Ed.2d 822, 832, 838-843, 84 S.Ct. 1814] (concurring opn. of Goldberg, J.); *Lombard* v. *Louisiana* (1962) 373 U.S. 267, 274, 275-276 [10 L.Ed.2d 338, 342, 343-344, 83 S.Ct. 1122] (concurring opn. of Douglas, J.); *Greenberg* v. *Western Turf Assn.* (1905) 148 Cal. 126, 128 [82 P. 684]; *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357, 362-363 [73 P. 1050]; *Willis* v. *McMahan* (1891) 89 Cal. 156 [26 P. 649]; *Turner* v.

---

[5]"(c) Exceptions. This section shall not apply in any of the following instances: (1) Where its application results in or is coupled with an act prohibited by the Unruh Civil Rights Act or any other provision of law relating to prohibited discrimination against any person on account of color, race, religion, creed, ancestry, or national origin. . . ." (San Rafael Mun. Code, § 8.12.210 (c) (1).)

*North Beach & Mission R.R.* (1868) 34 Cal. 594, 600; *Pleasants* v. *North Beach & Mission R.R.* (1868) 34 Cal. 586, 589.)

The California Legislature, in 1897, enacted these common law doctrines into the statutory predecessor of the present Unruh Civil Rights Act. (See Klein, *The California Equal Rights Statutes in Practice* (1958) 10 Stan.L.Rev. 253, 255-258.) The 1897 act provided: "That all citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities, privileges of inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1897, ch. 108, p. 137, § 1.) A 1919 amendment broadened the act to encompass public conveyances. (Stats. 1919, ch. 210, p. 309, § 1.) In 1923 the Legislature extended the act's coverage to "places where ice cream or soft drinks of any kind are sold for consumption on the premises. . . ." (Stats. 1923, ch. 235, p. 485, § 1.)

Following these initial amendments which evidenced the coverage of the Civil Rights Act to include more places of public accommodation, two cases arose which required this court to determine whether the Civil Rights Act prohibited only discrimination on grounds of race, religion, and national origin or prohibited all arbitrary discrimination.

In *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449], we held that the Civil Rights Act barred the manager of a race track from expelling a patron who had acquired a reputation as a man of immoral character. We noted that "Under our institutions the freedom to pursue the declared right [to public accommodations] on an equal basis is just as precious as many other freedoms and rights. The exercise of the power of its denial, being a restraint on a personal right, is circumscribed by the same constitutional safeguards of equal protection and due process as are restraints under penal laws." (36 Cal.2d at p. 739.) Hence, the court concluded that a racecourse constituted "a place of public entertainment," which is "so far affected with a public interest that the state might, in the interest of good order and fair dealing, require the proprietor to recognize its own tickets of admission." (36 Cal.2d at p. 739.)

Later, in *Stoumen* v. *Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969], we recognized the right of homosexuals to obtain food and drink in a bar and restaurant: "Members of the public of lawful age have a right to patronize a public restaurant and bar so long as they are acting properly and are not committing illegal and immoral acts; the proprietor has no right to exclude or eject a person 'except for good cause,' and if he does

so without good cause he is liable in damages. (See Civ. Code, §§ 51, 52.)"[6] (37 Cal.2d at p. 716; see *Tarbox* v. *Board of Supervisors* (1958) 163 Cal. App.2d 373, 378 [329 P.2d 553].) Thus, in *Stoumen* and *Orloff* this court clearly established that the Civil Rights Act prohibited all arbitrary discrimination in public accommodations.

In the late 1950's, however, the Legislature became concerned that Courts of Appeal, narrowly defining the kinds of businesses that afforded public accommodation, were improperly curtailing the scope of the public accommodations provisions. (See *Reed* v. *Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887, 890 [338 P.2d 633]; cf. *Swann* v. *Burkett* (1962) 209 Cal.App.2d 685, 690-691 [26 Cal.Rptr. 286]; Colley, *Civil Actions for Damages Arising out of Violations of Civil Rights* (1965) 17 Hastings L.J. 189, 194-195; Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal. L.Rev. 260, 261.) Accordingly, the Legislature, enacting the Unruh Act, modified the mandate that "All citizens . . . are entitled to the full and equal accommodations" and broadened its scope so that it read thereafter: "All citizens[7] . . . are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations . . . in all business establishments of every kind whatsoever"[8]

---

[6]Former Civil Code section 52 read as follows: "Whoever denies to any citizen, except for reasons applicable alike to every race or color, the full accommodations, advantages, facilities, and privileges enumerated in section fifty-one of this code, or who aids, or incites, such denial, or whoever makes any discrimination, distinction or restriction on account of color or race, or except for good cause, applicable alike to citizens of every color or race whatsoever, in respect to the admission of any citizen to . . . [any place of public accommodation] . . . is liable in damages in an amount not less than one hundred dollars. . . . " (Stats. 1923, ch. 235, p. 485, § 2.) The Legislature revised section 52 in 1959 to read: "Whoever denies, or who aids, or incites such denial, or whoever makes any distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code." (Stats. 1959, ch. 1866, p. 4424, § 2.) The initial words: "Whoever denies, or aids, or incites *such denial*" (italics added), clearly refer to all the arbitrary discriminations forbidden by section 51—including but not limited to race, religion, ancestry, color, or national origin. Moreover, our decisions in *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449], and *Stoumen* v. *Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969], which forbade all forms of arbitrary discrimination, relied upon Civil Code section 52 only on the question of damages and on section 51 for the significant declaration of equal rights to public accommodations.

[7]As noted *infra*, the Legislature in 1961 substituted "all persons" for "all citizens" to further broaden the applicability of section 51. (Stats. 1961, ch. 1187, p. 2920, § 1.)

[8]Former Civil Code section 53 read as follows: "It is unlawful for any corporation, person, or association, or the proprietor, lessee, or the agents of either, of any opera

The Legislature enacted the 1959 amendment subsequent to our decisions in *Orloff* and *Stoumen*. Neither of those cases restricted discrimination to "race, color, religion, ancestry or national origin"—the particular incidents of discrimination specified in the 1959 amendment. We must, of course, presume that the Legislature was well aware of these decisions.[9] (See *Richfield Oil Corp.* v. *Public Util. Com.* (1960) 54 Cal.2d 419, 430 [6 Cal.Rptr. 548, 354 P.2d 4].) We cannot infer from the 1959 amendment any legislative intent to deprive citizens in general of the rights declared by the statute and stanchioned by public policy. ■ "Without the most cogent and convincing evidence, a court will never attribute to the Legislature the intent to disregard or overturn a sound rule of public policy." (*Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 152 [23 Cal.Rptr. 592, 373 P.2d 640].) Although we recognize that a Legislature that contemplated civil rights legislation in the late 1950's or early 1960's would have been particularly concerned with the plight of racial minorities within the United States, the prosecution has not pre-

---

house, theater, melodeon, museum, circus, caravan, race course, fair, or other place of public amusement or entertainment, to refuse admittance to any person over the age of twenty-one years, who presents a ticket of admission acquired by purchase, or who tenders the price thereof for such ticket, and who demands admission to such place. Any person under the influence of liquor, or who is guilty of boisterous conduct, or any person of lewd or immoral character, may be excluded from such place of amusement." (Stats. 1905, ch. 413, p. 554, § 3.) Former Civil Code section 53 was repealed by statutes 1959, chapter 1866, page 4424, section 3. The 1959 amendment of section 51, which extended the statute so as to include all business establishments, was accompanied by the repeal of former section 53. In so doing the Legislature obviously intended to encompass within section 51 all of the enterprises theretofore governed by section 53 and to subject proprietors of all businesses serving the public to the same requirement that there be no arbitrary exclusion of would-be patrons.

[9]Immediately subsequent to our decision in *Orloff* that a convicted gambler could not be excluded from a race track on the vague and general ground that he was "immoral," the Legislature enacted Business and Professions Code section 19561.5 (Stats. 1951, ch. 1084, p. 2813, § 1) specifically providing that touts and gamblers, after a hearing, could be excluded from race tracks. In *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736, 741-742 [13 Cal.Rptr. 201, 361 P.2d 921], we upheld this specific legislation, which excluded persons previously convicted of illegal wagering from race tracks. We observed that *Orloff's* declaration of pre-existing common law and constitutional rights of access did not restrict the race track's authority to exclude persons convicted of illegal wagering. This discussion in *Flores* pertains only to race tracks; it did not specifically refer to business establishments in general. We predicated *Flores* on the correct conclusion that the Business and Professions Code, section 19561.5, did not deny equal protection of the law but constituted a reasonable classification having a substantial relation to a legitimate objective under a sufficiently definite standard. (*Id.* at p. 742.) We note that the 1959 Legislature reenacted that section as Business and Professions Code sections 19572 and 19573 (Stats. 1959, ch. 1828, p. 4358, § 2). There would have been no need to reenact a law specifically overruling the particular issue in *Orloff* if the same Legislature were simultaneously removing the underpinnings of the decision by amendment to Civil Code sections 51-54.

sented one shred of legislative history which would suggest an intent to disregard the sound rule of public policy enunciated by this court in our *Orloff* and *Stoumen* decisions.[10]

■ The nature of the 1959 amendments, the past judicial interpretation of the act, and the history of legislative action that extended the statutes' scope, indicate that identification of particular bases of discrimination—color, race, religion, ancestry, and national origin—added by the 1959 amendment, is illustrative rather than restrictive. (Stats. 1959, ch. 1866, p. 4424, § 1.) Although the legislation has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel the conclusion that the Legislature intended to prohibit all arbitrary discrimination by business establishments. Finally, in 1961 the Legislature substituted "all persons" for "all citizens" (Stats. 1961, ch. 1187, p. 2920, § 1) in order to broaden further the section and complete the consistent pattern of wide applicability of the section. ■ We therefore conclude that a business generally open to the public may not arbitrarily exclude a would-be customer from its premises and, upon the customer's refusal to leave, subject him to criminal conviction under the San Rafael ordinance as read in conjunction with the Unruh Civil Rights Act.[11]

[10]In *Nanez* v. *Ritger* (E.D. Wis. 1969) 304 F.Supp. 354, several patrons brought an action under the federal Civil Rights Act of 1964 against the proprietor of a restaurant for alleged discriminatory eviction from the business premises. The patrons alleged that they peaceably attempted to secure service at the proprietor's establishment. The proprietor arbitrarily and without stating any reason requested that the patrons leave the restaurant. Upon their refusal to do so, the proprietor obtained the assistance of two police officers. The patrons did not allege any discrimination on the basis of race, color, religion, or national origin and the proprietor moved to dismiss. The court held: "The Civil Rights Act of 1964, specifically 42 U.S.C. § 2000a, prohibits discrimination on the grounds of race, color, religion, or national origin in a place of public accommodation. The plaintiffs do not claim that they were discriminated against on any of these specific grounds. However, to fit under § 1983, an act of discrimination need not be on any of the four specific grounds spelled out in the Civil Rights Act; any invidious discrimination would appear to be covered." (*Id.* at p. 356.)

[11]A contrary conclusion would constitute a denial of equal protection of the law. (See *Orloff* v. *Los Angeles Turf Club, supra,* 36 Cal.2d 734, 742.) The equal protection clause of the Fourteenth Amendment clearly prohibits irrational, arbitrary, or unreasonable discrimination. (See, e.g., *Loving* v. *Virginia* (1967) 388 U.S. 1, 8-9 [18 L.Ed.2d 1010, 1015-1016, 87 S.Ct. 1817]; *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101].) The shopping center has undertaken the public function of providing society with the necessities of life and has become the modern suburban counterpart of the town center. (See *Amalgamated Food Emp.* v. *Logan Valley Plaza* (1968) 391 U.S. 308, 319-320 [20 L.Ed.2d 603, 612-613, 88 S.Ct. 1601]; *In re Lane* (1969) 71 Cal.2d 872, 874-875 [79 Cal.Rptr. 729, 457 P.2d 561]; *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 771 [40 Cal.Rptr. 233, 394 P.2d 921].) As the United States Supreme Court observed in the case of a privately owned city park, "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." (*Evans* v. *Newton*

■ In holding that the Civil Rights Act forbids a business establishment generally open to the public from arbitrarily excluding a prospective customer, we do not imply that the establishment may never insist that a patron leave the premises.[12] Clearly, an entrepreneur need not tolerate customers who damage property, injure others, or otherwise disrupt his business. A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided. (See *Orloff* v. *Los Angeles Turf Club, supra,* 36 Cal.2d 734, 740-741.)[13] ■ In the absence of a finding of facts by the trial court, however, we cannot determine whether the shopping center excluded petitioner upon such a reasonable basis.

■ In ultimately determining whether the shopping center did rely upon a reasonable ground in requesting petitioner to quit the premises, the trial court will bear in mind that the shopping center has generally opened the premises to the public and invited it to treat the center as the modern analogue of the town center.[14] The shopping center may no more exclude

---

(1966) 382 U.S. 296, 299 [15 L.Ed.2d 373, 377, 86 S.Ct. 486]; see *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, 722 [6 L.Ed.2d 45, 50, 81 S.Ct. 856].) In *Logan Valley, Lane* and *Schwartz-Torrance,* the United States Supreme Court and this court found "state action" under the Fourteenth Amendment in a shopping center's refusal to permit the exercise of First Amendment rights in such public areas as sidewalks, parks, and malls. (See *Marsh* v. *Alabama* (1946) 326 U.S. 501, 507-508 [90 L.Ed. 265, 269, 66 S.Ct. 276].) Similarly, the Fourteenth Amendment forbids a shopping center from discriminating arbitrarily among those who seek to be its customers and from subjecting to criminal sanctions those who refuse to leave.

[12]"Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the *statutory* and constitutional rights of those who use it." (Italics added.) *Marsh* v. *Alabama, supra,* 326 U.S. 501, 506 [90 L.Ed. 265, 268].)

[13]We distinguish between the right of the business establishment under the Unruh Civil Rights Act to impose upon patrons reasonable regulations rationally related to the services performed and the facilities provided, and the right of the shopping center under the First Amendment to regulate the use of its streets, sidewalks and other public areas to the extent provided by the Penal Code sections 647c and 415. (See *infra* pp. 26-31.) Obviously, the various business establishments within a shopping center might require different and more stringent standards of decorum than those called for in public areas. (Cf., e.g., *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 101 [84 Cal.Rptr. 113, 465 P.2d 1].)

[14]Compare Penal Code section 602.5, which forbids a person from entering or remaining in any *noncommercial* dwelling house or apartment without the consent of the owner or the individual in charge of the property. In this noncommercial setting the statute properly "punish[es] presence on property unauthorized by the possessor thereof and conclusively presume[s] injury from that presence." (*In re Hoffman* (1967) 67 Cal.2d 845, 848 [64 Cal.Rptr. 97, 434 P.2d 353].) Penal Code section 602.5 protects the individual's privacy in his own home. Obviously, Civil Code section 51 permits individuals to prohibit and prevent intrusion upon noncommercial property.

individuals who wear long hair or unconventional dress,[15] who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union, merely because of these characteristics or associations, than may the City of San Rafael.[16]

In undertaking to provide the necessities and amenities of life, the shopping center performs an important public function. In some areas the public must rely upon the shopping center as its sole source of food, clothing and other commodities. If a shopping center arbitrarily denies individuals the right to purchase essentials, these people may have no practicable alternative source of supply. Our modern society has become so interdependent and interrelated that those who perform a significant public function may not erect barriers of arbitrary discrimination in the marketplace.

### 3. *The San Rafael trespass ordinance is not preempted by state law.*

In this section we consider, but reject, petitioner's contention that San Rafael Municipal Code section 8.12.210 violates the California Constitution in that it attempts to impose additional strictures in the field of trespass which the state Legislature has preempted by general law. If state law had thus preempted the ordinance, petitioner, regardless of the facts of the case, could not properly have been prosecuted under the ordinance.

In considering this question of preemption we must begin our analysis with two constitutional provisions:[17] Article XI, section 7 (formerly Cal.

---

[15]See *Breen* v. *Kahl* (7th Cir. 1969) 419 F.2d 1034, 1036; cf. *Richards* v. *Thurston* (1st Cir. 1970) 424 F.2d 1281, 1283-1284; *Hughes* v. *Rizzo* (E.D.Pa. 1968) 282 F.Supp. 881, 884; *Myers* v. *Arcata etc. School Dist.* (1969) 269 Cal.App.2d 549, 557 [75 Cal.Rptr. 68] (hg. den.).

[16]See, e.g., *Evans* v. *Newton, supra,* 382 U.S. 296, 301-302 [15 L.Ed.2d 373, 378] (privately owned city park generally open to the public); *Shuttlesworth* v. *Birmingham* (1965) 382 U.S. 87, 88-89 [15 L.Ed.2d 176, 178, 86 S.Ct. 211] (city street and sidewalk); *Wright* v. *Georgia* (1963) 373 U.S. 284, 285-286 [10 L.Ed.2d 349, 351, 83 S.Ct. 1240] (city park and playground); *Burton* v. *Wilmington Parking Authority, supra,* 365 U.S. 715, 716 [6 L.Ed.2d 45, 47] (restaurant and municipal parking lot); *Thompson* v. *City of Louisville* (1960) 362 U.S. 199, 200 [4 L.Ed.2d 654, 655, 80 S.Ct. 624] (cafe); *Marsh* v. *Alabama, supra,* 326 U.S. 501, 507-508 [90 L.Ed. 265, 269] (streets and sidewalks of company town); *Nanez* v. *Ritger, supra,* 304 F.Supp. 354, 356-357 (restaurant); *In re Hoffman, supra,* 67 Cal.2d 845, 847 (railway terminal); *In re Cregler* (1961) 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305] (bus depot).)

[17]Several constitutional amendments proposed by the Constitution Revision Commission were submitted to the voters at the election held on June 2, 1970. Proposition 2, the only such amendment to pass, contained provisions repealing article XI, sections 6 and 11, and reenacting language substantially identical to that contained in those sections, in article XI, sections 5(a) and 7. For the purposes of the present litigation

Const. art. XI, § 11), of the California Constitution provides that: "A county or city may make and enforce within its limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws." Section 5(a) of article XI (formerly Cal. Const. art. XI, § 6) provides that chartered cities may "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

In regulating trespassory conduct, the Legislature has enacted numerous statutes. They include Penal Code sections 365, 415, 418, 419, 420, 553-555.3, 558-558.1, 587-587b, 592, 593b, 602, subdivisions (a)-(n), 602.5, 647, subdivisions (g)-(i), 647c; Fish and Game Code, sections 2016, 2018; Health and Safety Code section 8101; Military and Veterans' Code sections 398, 1650, 1651; Water Code section 1052; and Civil Code section 51. Despite this impressive array of laws, the state has significantly failed to prohibit a would-be customer, after being requested to leave, from remaining on business premises generally open to the public.

Petitioner contends that these statutes constitute a comprehensive legislative scheme completely regulating trespasses on property. Moreover, he argues that the Legislature has enacted trespass provisions which, completely protecting the valid interests of property owners from unauthorized presence of intruders, fully occupy the constitutionally permissible scope of such legislation. Finally, petitioner contends that although San Rafael, as a chartered city, enjoys a home rule provision and retains complete power to legislate in regard to municipal affairs, it may not enact a trespass ordinance in an area in which "the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." (*In re Hubbard, supra,* 62 Cal.2d 119, 128; see *Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535, 539 [86 Cal. Rptr. 673, 469 P.2d 353]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 859-860 [76 Cal.Rptr. 642, 452 P.2d 930]; *In re Lane* (1962) 58 Cal.2d 99, 106 [22 Cal.Rptr. 857, 372 P.2d 897]; *Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 681-682 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].)

In the case of conflict between a state enactment which discloses an intent fully to occupy the field, and a local ordinance of a chartered home rule

constitutional revision does not affect the status of the San Rafael trespass ordinance. (See Cal. Const., art. XI, § 13; cf. *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 772, fn. 1 [87 Cal.Rptr. 839, 471 P.2d 847].)

city, the question may arise whether the matter is a municipal affair or one of statewide concern. (See *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62-63 [81 Cal.Rptr. 465, 460 P.2d 137].) ■ (See fn. 18) In the present case, however, we do not reach that issue, inasmuch as the Legislature has expressly evidenced its intent in Penal Code section 647c to permit local regulation of "conduct upon a street, sidewalk, or other public place on or in a place open to the public."[18] (See *Baron* v. *City of Los Angeles, supra,* 2 Cal.3d 535, 539; *Bishop* v. *City of San Jose* (1969) *supra,* 1 Cal.3d 56, 63-64.) ■ Furthermore, trespass has long been an area in which local units have legislated; such an area may involve special local problems of facilities and geography with which a state Legislature could cope only with difficulty. In *In re Hoffman, supra,* 67 Cal.2d 845, 848-851, we recognized that municipalities have a governmental interest in preserving the proprietary interests of non-commercial property owners from intrusions upon their privacy, and in protecting all property owners from obstructions of their property's use (see *In re Zerbe* (1964) 60 Cal.2d 666, 670 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840]).

For the above reasons we conclude that Penal Code section 647c expressly permits municipalities to regulate obstructions of its streets, sidewalks, public places, or places open to the public. Section 8.12.210 of the San Rafael Municipal Code is thus not preempted under article XI of the California Constitution.

---

[18]Petitioner unrealistically argues that mere presence upon a sidewalk does not constitute "conduct" within this express legislative grant of authority to localities to regulate traffic upon their thoroughfares, walkways, and other public areas. In contrast, the prosecution apparently wishes to broaden the word "conduct" in Penal Code section 647c to permit the municipality to regulate disorderly conduct and vagrancy, areas which have expressly been preempted by state law. (See *In re Koehne* (1963) 59 Cal.2d 646 [30 Cal.Rptr. 809, 381 P.2d 633].) We adopt the position of neither petitioner nor prosecution. In 1959 the Assembly Interim Committee on Criminal Procedure undertook a thorough study of the state and local laws of California concerning vagrancy and disorderly conduct. The committee found that many of the then existing enactments were of dubious constitutionality and had been improperly extended to harass "undesirables," and to punish many kinds of innocent conduct that the committee no longer considered heinous. (22 Assembly Interim Com. Report No. 1 (1959-1961).) The interim committee proposed legislation, later enacted into law, which prescribed the limits of legislation in this area and rejected many alternative forms of penal provisions concerning disorderly conduct and vagrancy. (See Pen. Code, § 647.) In a later portion of this opinion we construe the San Rafael ordinance's somewhat vague prohibition of "offensive personal conduct" to coincide exactly with those offenses punishable under Penal Code section 647c (obstruction of a street, sidewalk, or other public area) or under Penal Code section 415 (disturbing the peace; see *In re Bushman* (1970) 1 Cal.3d 767, 773-775 [83 Cal.Rptr. 375, 463 P.2d 727]). This necessarily narrowing construction preserves the constitutionality of the ordinance, and likewise avoids a preemptive conflict between the San Rafael trespass ordinance and state law.

### 4. *The San Rafael trespass ordinance is not void on its face*

Petitioner contends that the local ordinance on its face constitutes an unconstitutional infringement on First Amendment rights. In enacting section 8.12.210 of the San Rafael Municipal Code, the City Council of San Rafael engrafted upon its trespass ordinance an exception for any "interference with or inhibition of any other exercise of a constitutionally protected right of freedom of speech such as (but not limited to) peaceful expressions of political or religious opinions, not involving offensive personal conduct. . . ." (San Rafael Mun. Code, § 8.12.210 (c)(4).)

Petitioner charges that the phrase "offensive personal conduct" is simply too vague and broad a standard for the regulation of expression or conduct intertwined with expression. The prosecution in its return to the writ concedes: "The term 'offensive personal conduct' should be narrowly construed so that it applies to some act other than the 'speech' itself but its use does not render the ordinance unconstitutional." We accept the prosecution's suggestion and construe the provision so as to avoid the constitutional infirmities of the entire trespass ordinance and particularly the phrase "offensive personal conduct." (See *Ashwander* v. *T.V.A.* (1936) 297 U.S. 288, 341, 345-348 [80 L.Ed. 688, 707, 709-711, 56 S.Ct. 466] (concurring opn. of Brandeis, J.).)

As we have very recently observed in *In re Bushman, supra,* 1 Cal.3d 767, 773-775, the term "offensive," in the absence of a narrowing construction, might proscribe conduct which is protected by the First Amendment.[19] Under the ordinance a shopowner or guard at the center might find a picket sign or leaflet "offensive" merely because of disagreement with its content. The very presence of an individual who sought to exercise his freedom of speech, who dressed in unconventional clothing, wore a beard, or displayed an unusual hair style might cause a guard at the center to react with resentment, vexation, or annoyance.

As the United States Supreme Court observed in *Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894], ". . . a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." As the Court of Appeal has concluded, the "constitutional

---

[19]In *In re Bushman, supra,* 1 Cal.3d 767, 773, we held, as to the word "offensive" that an individual may be found "guilty of disturbing the peace through 'offensive' conduct if by his actions he wilfully and maliciously incites others to violence or engages in conduct" presenting a clear and present danger of inciting "others to violence."

right to speak, demonstrate, and picket on behalf of causes known to be highly offensive to those picketed was settled in *Terminiello*. . . ." (*People v. Huss* (1966) 241 Cal.App.2d 361, 366 [51 Cal.Rptr. 56].) Thus the First Amendment nullifies an ordinance so loosely drawn that a police officer can construe it to mean that he can expel from public places persons whom he finds objectionable. To give the police officer the ambulatory power to act as an uncontrolled roving legislature is to give him a license to vitiate the First Amendment. (See *Bachellar* v. *Maryland* (1970) 397 U.S. 564 [25 L.Ed.2d 570, 90 S.Ct. 1312]; *In re Davis* (1966) 242 Cal. App.2d 645, 655 [51 Cal.Rptr. 702].)

Furthermore, the United States Supreme Court has fixed the guidelines to determine the kind of activity that would properly qualify for the ordinance's "offensive personal conduct." In *Shuttlesworth* v. *Birmingham* (1965) 382 U.S. 87 [15 L.Ed.2d 176, 86 S.Ct. 211], that court confronted facts analogous to those alleged here.[20] Finding no evidence that Shuttlesworth obstructed pedestrian passage by his mere presence on the street, the Supreme Court recognized a grave constitutional defect in an ordinance which forbade "any person to stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on." The court observed that "this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration. It 'does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.' *Cox* v. *Louisiana* [1965] 379 U.S. 559, 579 [13 L.Ed.2d 487, 501, 85 S.Ct. 476] (separate opinion of Mr. Justice Black). Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state." (382 U.S. at pp. 90-91 [15 L.Ed.2d at p. 179].) (Fns. omitted.)

Since the Alabama Court of Appeals, however, had given the Birmingham ordinance an explicitly narrow construction, which saved its constitutionality, the United States Supreme Court did not hold the ordinance

---

[20]In *Shuttlesworth* a small, orderly group of black citizens of Birmingham were standing on a sidewalk near an intersection when a police officer thrice requested them to clear the sidewalk for pedestrian passage. After the third request, all but Shuttlesworth, who had been questioning the officer concerning his order, had begun to walk away. The policeman told Shuttlesworth he was under arrest, to which he responded, "Well, I will go into the store," and walked into the entrance of the department store. The officer followed and took him into custody. The court observed that the record contained many references to a "selective buying campaign" in which black citizens of Birmingham were engaged in boycotting some white stores. "There was no showing, however, of any connection between this campaign and the presence of the petitioner and his companions outside the department store on the morning of the arrest." (382 U.S. at pp. 89-90 & fn. 3 [15 L.Ed.2d at pp. 178-179].)

void. The Alabama court had ruled that the ordinance "is directed at obstructing the free passage over, on or along a street or sidewalk by the manner in which a person accused stands, loiters or walks thereupon. Our decisions make it clear that the mere refusal to move on after a police officer's requesting that a person standing or loitering should do so is not enough to support the offense. . . . [T]here must also be a showing of the accused's blocking free passage. . . ." (*Middlebrooks* v. *City of Birmingham* (1964) 42 Ala.App. 525, 527 [170 So.2d 424, 426]; see *Shuttlesworth* v. *Birmingham, supra,* 382 U.S. 87, 91-92 [15 L.Ed.2d 176, 179-180].)

Thus, in order similarly to save the constitutionality of San Rafael Municipal Code section 8.12.210, we must construe it to encompass both the protection of the property owner's legitimate interest in preventing physical interference with the business use, disturbances of the peace (see *In re Bushman, supra,* 1 Cal.3d 767, 773-775) or physical obstruction of the premises (see *Shuttlesworth* v. *Birmingham, supra,* 382 U.S. 87 [15 L.Ed.2d 176]), as well as the preservation of "an effective place for the dissemination of ideas." (See *In re Hoffman, supra,* 67 Cal.2d 845, 853.) We therefore construe the trespass ordinance, and particularly the words "offensive personal conduct," as applied to the use of streets, sidewalks, and other public areas, to coincide with those offenses punishable under Penal Code section 647c (obstruction of a street, sidewalk, or other public area; see *Shuttlesworth* v. *Birmingham, supra,* 382 U.S. 87, 91 [15 L.Ed.2d 176, 179]) and under Penal Code section 415 (disturbing the peace; see *In re Bushman, supra,* 1 Cal.3d 767, 773).

Petitioner finally contends that even if the San Rafael ordinance has not been preempted by state law and does not fail for vagueness, the First Amendment protects his conduct so that the ordinance may not constitutionally be applied to him. Petitioner argues that the shopping center abridged his First Amendment freedom of association and freedom of speech in ejecting him from the center for talking with a friend who wore long hair and unconventional clothing.[21] We have explained above, however, that First Amendment rights are not absolutes; the protected conduct begins with the expression of opinion but stops with the perpetration of violence; free discussion must die upon the battlefields of force. (See Comment, 56 Cal.L.Rev. (1968) 702, 749-754.)

At this stage of the proceedings the facts of the case have not been

---

[21]See *Breen* v. *Kuhl, supra,* 419 F.2d 1034, 1036; *Richards* v. *Thurston, supra,* 424 F.2d 1281, 1283-1284; *Wheeler* v. *Goodman* (W.D.N.C. 1969) 306 F.Supp. 58, 62; *Hughes* v. *Rizzo, supra,* 282 F.Supp. 881, 884; *Myers* v. *Arcata etc. School Dist., supra,* 269 Cal.App.2d 549, 557 (hg. den.).

established.[22] Although, without proof of petitioner's particular conduct, we have been in a position to resolve the legal questions of whether the challenged ordinance is constitutionally void for vagueness or preempted by state law, we cannot fix petitioner's First Amendment rights in that void.[23] (See *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 98 [84 L.Ed. 1093, 1100, 60 S.Ct. 746]; Note, *The First Amendment Overbreadth Doctrine* (1970) 83 Harv.L.Rev. 844, 845; cf. *Brown* v. *Louisiana* (1966) 383 U.S. 131, 143, 147-148 [15 L.Ed.2d 637, 646, 648-649, 86 S.Ct. 719]. (Brennan, J., concurring in judgment); *NAACP* v. *Button* (1962) 371 U.S. 415, 432 [9 L.Ed.2d 405, 417, 83 S.Ct. 328].) In view of our above delineation of the scope of the First Amendment, we cannot determine on pretrial habeas corpus, in the absence of the established facts, whether petitioner's conduct is protected by the First Amendment.

In conclusion, we find no more succinct expression of our view of this case than that stated in 1890 by the Supreme Court of Michigan (*Ferguson* v. *Giles*, 82 Mich. 358, 367-368 [46 N.W. 718, 721]: "The man who goes either by himself or with his family to a public place must expect to meet and mingle with all classes of people. He cannot ask, to suit his caprice or prejudice or social views, that this or that man shall be excluded because he does not wish to associate with them. He may draw his social line as

---

[22]This case is unlike *In re Allen, supra*, 59 Cal.2d 5, 7, in which the complaint showed on its face that no public offense was charged (see *In re Zerbe, supra*, 60 Cal.2d 666, 668, 670).

[23]We do, of course, realize the chilling effect that prosecution might exert in deterring petitioner and other individuals from exercising their fundamental rights. (See *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 494 [14 L.Ed.2d 22, 32, 85 S.Ct. 1116].) But, without the facts, an appellate court cannot successfully ascertain on pretrial habeas corpus whether petitioner's conduct deserves protection from criminal prosecution. (Cf. *In re Hochberg* (1969) 2 Cal.3d 870, 873-876 [87 Cal.Rptr. 681, 471 P.2d 1]; *In re Haro* (1969) 71 Cal.2d 1021, 1025 [80 Cal.Rptr. 588, 458 P.2d 500].) The municipal court before which petitioner may come to trial stands in a far better position than this court to alleviate this chilling effect in the first instance. If the defendant requests, the trial court may, of course, initially determine as a matter of law the ultimate question of First Amendment protection upon a hearing before the trial of the case. (*People* v. *Noroff* (1967) 67 Cal.2d 791, 793 [63 Cal.Rptr. 575, 433 P.2d 479]; *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 904, 908-911 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) Unless the trial court determines that petitioner's conduct was protected because the shopping center cannot explain its exclusion of petitioner except as an exercise of its power arbitrarily to exclude would-be customers, the case must then proceed to trial. (See *Shuttlesworth* v. *Birmingham, supra*, 382 U.S. 87, 90-91 [15 L.Ed.2d 176, 179]; *Jackson* v. *Denno* (1964) 378 U.S. 368, 390, fn. 18 [12 L.Ed.2d 908, 923, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; Monaghan, *First Amendment "Due Process"* (1970) 83 Harv.L.Rev. 518, 531-532.) At the present stage, however, this court is not equipped to consider the validity of petitioner's claim that the First Amendment protected his conduct.

closely as he chooses at his home, or in other private places, but he cannot in a public place carry the privacy of his home with him, or ask that people not as good or great as he is shall step aside when he appears."

The writ of habeas corpus is denied and the order to show cause is discharged.

McComb, Acting C. J., Peters, J., Mosk, J., Burke, J., Sullivan, J., and Molinari, J.,* concurred.

Respondent's petition for a rehearing was denied October 28, 1970, and the opinion was modified to read as printed above.

*Assigned by the Chairman of the Judicial Council.