BILL LOCKYER Attorney General MARC J. NOLAN Deputy Attorney General
THE HONORABLE NICOLE M. PARRA, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
Does the prohibition against the unauthorized use of registered sex offender identifying information obtained from the California "Megan's Law" Web site qualify registered sex offenders as a "protected class" for purposes of housing discrimination under the Fair Employment and Housing Act?
 CONCLUSION
The prohibition against the unauthorized use of registered sex offender identifying information obtained from the California "Megan's Law" Web site does not in itself qualify registered sex offenders as a "protected class" for purposes of housing discrimination under the Fair Employment and Housing Act.
 ANALYSIS
Under California's version of "Megan's Law,"[1] a person who has been convicted of one or more specified sex offenses but is no longer incarcerated must register as a sex offender with the appropriate law enforcement agency where he or she resides. (Pen. Code, §§ 290, 290.4; 83 Ops.Cal.Atty.Gen. 143, 144-145 (2000); 82 Ops.Cal.Atty.Gen., supra, at p. 21.)[2] The uncodified preamble to this statutory scheme provides in relevant part:
"The Legislature finds and declares the following:
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(b) It is a compelling and necessary public interest that the public have information concerning persons convicted of offenses involving unlawful sexual behavior collected pursuant to sections 290 and 290.4 of the Penal Code to allow members of the public to adequately protect themselves and their children from these persons.
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(g) The Legislature also declares, however, that in making information available about certain sex offenders to the public, it does not intend that the information be used to inflict retribution or additional punishment on any such person convicted of a sexual offense. While the Legislature is aware of the possibility of misuse, it finds that the dangers to the public of nondisclosure far outweigh the risk of possible misuse of the information. The Legislature is further aware of studies in Oregon and Washington indicating that community notification laws and public release of similar information in those states have resulted in little criminal misuse of the information and that the enhancement to public safety has been significant." (Stats. 1996, ch. 908, § 1.)
Section 290.46 requires the Department of Justice ("Department") to make available to the public on its Internet Web site information concerning sex offender registrants convicted of specified sex offenses. The information includes the person's name, a photograph, a physical description, date of birth, criminal history, and depending upon the seriousness of the person's offense, either the person's residence address or the name of the community and ZIP code in which the person resides. (§ 290.46, subds. (a), (b)(1), (c)(1), (d)(1).) However, subdivision (j)(2) of section 290.46 also states with respect to the use of the information:
 "Except as authorized under paragraph (1) or any other provision of law, use of any information that is disclosed pursuant to this section for purposes relating to any of the following is prohibited:
"(A) Health insurance.
"(B) Insurance.
"(C) Loans.
"(D) Credit.
"(E) Employment.
"(F) Education, scholarships, or fellowships.
"(G) Housing or accommodations.
 "(H) Benefits, privileges, or services provided by any business establishment."[3]
We are asked whether the statutory prohibition against the unauthorized use of registered sex offender information for purposes relating to housing (§ 290.46, subd. (j)(2)(G)) makes sex offender registrants a "protected class" for purposes of housing discrimination under the Fair Employment and Housing Act (Gov. Code, §§ 12900-12996; "Act"). We conclude that section 290.46, subdivision (j)(2)(G), does not in itself confer upon registered sex offenders the special status of a "protected class" with respect to housing for purposes of the Act.
Preliminarily, we note that when accessing the Department's Web site, users are informed: "The information on this Web site is made available solely to protect the public. Anyone who uses this information to commit a crime or to harass an offender or his or her family is subject to criminal prosecution and civil liability." Specifically, section 290.46, subdivision (h), provides criminal penalties for those who use information from the Web site to commit a misdemeanor or felony. Section 290.46, subdivision (j)(4), provides with respect to civil liability:
 "(A) Any use of information disclosed pursuant to this section for purposes other than those provided by paragraph (1) or in violation of paragraph (2) shall make the user liable for the actual damages, and any amount that may be determined by a jury or a court sitting without a jury, not exceeding three times the amount of actual damage, and not less than two hundred fifty dollars ($250), and attorney's fees, exemplary damages, or a civil penalty not exceeding twenty-five thousand dollars ($25,000).
 "(B) Whenever there is reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of misuse of the information available via the Internet Web site in violation of paragraph (2), the Attorney General, any district attorney, or city attorney, or any person aggrieved by the misuse is authorized to bring a civil action in the appropriate court requesting preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or group of persons responsible for the pattern or practice of misuse. The foregoing remedies shall be independent of any other remedies or procedures that may be available to an aggrieved party under other provisions of law, including Part 2 (commencing with Section 43) of Division 1 of the Civil Code."
Section 290.46, subdivision (j), is unequivocal. A registered sex offender may be denied housing "to protect a person at risk" or for some other reason that is authorized by a specific "provision of law." Use of the identifying information from the Megan's Law Web site to deny housing for any other reason will subject the person making such improper use of the information to civil liability under subdivision (j)(4). However, nothing in subdivision (j)(2)(G) designates registered sex offenders as individuals belonging to a "protected class" under the Act.
Turning to the Act, then, we find that its provisions fashion a different mechanism for prohibiting discrimination against individuals based upon certain enumerated criteria in the areas of employment and housing (Gov. Code, §§ 12940, 12955); the Act also makes freedom from such discrimination a civil right (Gov. Code, § 12921). Government Code section 12920 states in part:
 ". . . [T]he practice of discrimination because of race, color, religion, sex, marital status, national origin, ancestry, familial status, disability, or sexual orientation in housing accommodations is declared to be against public policy."
The Fair Employment and Housing Commission ("Commission") is charged with conducting administrative proceedings in response to allegations of housing discrimination, and if the allegations are sustained, the Commission may issue cease and desist orders, require the sale or rental of the housing accommodation, order the provision of financial assistance and other privileges, assess a civil penalty not exceeding $10,000 (unless prior violations have occurred), order payment of actual damages and attorney's fees to the complainant, and order affirmative or prospective relief. (Gov. Code, § 12987, subd. (a).) Parties alleging housing discrimination under the Act may also follow procedures for pursuing their civil claims in court. (Gov. Code, §§ 12989, 12989.1.)
A claim of housing discrimination must demonstrate, among other things, that the person is a member of a class protected from such discrimination. (Department of Fair Employment Housing v.Superior Court (2002) 99 Cal.App.4th 896, 902.) The Act prohibits housing discrimination on account of "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, or disability" (Gov. Code, § 12955, subd. (a)), or on any basis prohibited by the Unruh Civil Rights Act (Gov. Code, §§ 12948, 12955, subd. (d); Civ. Code, § 51; "Unruh Act"). The Unruh Act bars discrimination on the basis of "sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation" (Civ. Code, § 51, subd. (b)), as well as additional, non-enumerated classifications recognized by the courts (see Koebke v. Bernardo Heights Country Club (2005)36 Cal.4th 824, 839-848; Harris v. Capital Growth Investors XIV
(1991) 52 Cal.3d 1142, 1155; Scripps Clinic v. Superior Court
(2003) 108 Cal.App.4th 917, 932).
Recently in Koebke v. Bernardo Heights Country Club, supra,36 Cal.4th 824, the Supreme Court concluded that registered domestic partners (Fam. Code, §§ 297-299.6) were a protected class under the Unruh Act. The court summarized the relevant law as follows:
 "Civil Code section 51, subdivision (b) states: `All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.' Enacted in 1959, the Unruh Act amended an 1897 version of Civil Code section 51 that was declarative of a common law doctrine requiring places of public accommodation `to serve all customers on reasonable terms without discrimination and . . . to provide the kind of product or service reasonably to be expected from their economic role.' (In re Cox (1970) 3 Cal.3d 205, 212 (Cox).)
 "Seminal decisions of this court construing the scope of the [Unruh] Act concluded that its protections were not confined to the enumerated categories in the statute but that these categories were `illustrative rather than restrictive.' (Cox, supra, 3 Cal.3d at p. 216 [the Act prohibits a business from excluding a customer because of his association with another person of unconventional appearance]; Marina Point Ltd. v. Wolfson (1982) 30 Cal.3d 721, 735 [the Act prohibits an apartment owner from refusing to rent an apartment to a family with a minor child]; O'Connor v. Village Green Owners Assn. (1983) 33 Cal.3d 790
[the Act prohibits a condominium development from restricting residence to persons over 18].) We also concluded that in enacting the Unruh Act, the Legislature intended to ban all forms of arbitrary discrimination in public accommodations. (Isbister v. Boys' Club of Santa Cruz (1985) 40 Cal.3d 72, 75
[`The Act is this state's bulwark against arbitrary discrimination in places of public accommodation'].)
 "We revisited these conclusions in Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142
(Harris). In the process of doing so, we created a three-part analytic framework for determining whether a future claim of discrimination, involving a category not enumerated in the statute or added by prior judicial construction, should be cognizable under the Act.
 "Harris involved a claim by women receiving public assistance that a landlord's policy requiring prospective tenants to have gross monthly incomes equal to or greater than three times the rent charged for an apartment (the minimum income policy) constituted economic status discrimination and was barred by the Unruh Civil Rights Act. . . . We held that the Unruh Act did not include within its ambit claims of economic status discrimination because economic status is fundamentally different than the categories either enumerated in the Act or added by judicial construction.
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 ". . . . First, in reviewing the statutory language, we discerned an essential difference between economic status and both the [Unruh] Act's enumerated categories and those added by judicial construction. We found that their common element was that they `involve personal as opposed to economic characteristics — a person's geographical origin, physical attributes, and personal beliefs.' (Harris, supra, 52 Cal.3d at p. 1160.) Thus, the first prong of the Harris inquiry is whether a new claim of discrimination under the [Unruh] Act is based on a classification that involves personal characteristics.
 "Second, we asked in Harris whether a legitimate business interest justified the minimum income policy. We found it did. `The minimum income policy is no different in its purpose or effect from stated price or payment terms. Like those terms, it seeks to obtain for a business establishment the benefit of its bargain with the consumer: full payment of the price. In pursuit of the object of securing payment, a landlord has a legitimate and direct economic interest in the income level of prospective tenants, as opposed to their sex, race, religion, or other personal beliefs or characteristics.' (Harris, supra, 52 Cal.3d at p. 1163.)
 "Third, we considered the potential consequences of allowing claims for economic status discrimination to proceed under the Unruh Act. We perceived `two significant adverse consequences that would likely follow from plaintiffs' proposed interpretation of the [Unruh] Act.' (Harris, supra, 52 Cal.3d at p. 1166.) First, we believed it would involve courts `in a multitude of microeconomic decisions we are ill equipped to make' regarding the reasonableness of the criteria used by landlords to screen tenants unable to pay their rent regularly and on time throughout the tenancy. (Ibid.) Second, permitting prospective tenants to challenge such criteria on a case-by-case basis might induce landlords to abandon such neutral criteria as income, applicable to all prospective tenants regardless of their personal characteristics, and use subjective criteria that might `disguise and thereby promote the very kinds of invidious discrimination based on race, sex and other personal traits that the Unruh Act prohibits.' (Id. at p. 1169.) Therefore we concluded that the minimum income policy did not violate the [Unruh] Act. (Ibid.)" (Id. at pp. 839-842.)
The three-prong approach of Harris presents a different test than the one specified in section 290.46. Its application is not dependent upon the person establishing that he or she qualifies as a registered sex offender for purposes of section 290.46. Under the latter statute, registered sex offenders may be subject to housing discrimination "to protect a person at risk" and as authorized by "any provision of law," but for no other reason. Under the Act, on the other hand, a claimant falling under a non-enumerated classification must satisfy the three-prongHarris test to prove unlawful housing discrimination in the particular circumstances.
We conclude that the prohibition against the unauthorized use of registered sex offender identifying information obtained from the California "Megan's Law" Web site does not in itself qualify registered sex offenders as a "protected class" for purposes of housing discrimination under the Act.
[1] Following public reaction to the abduction, rape, and murder of seven-year-old Megan Kanka in 1994, New Jersey enacted the Registration and Notification of Release of Certain Offenders Act, commonly known as "Megan's Law." The man who later confessed to Megan's murder in New Jersey lived across the street from the Kanka family and, unknown to the community, had twice been convicted of sex offenses involving young girls. (82 Ops.Cal.Atty.Gen., 20, 21, fn. 1 (1999).) "The crime gave impetus to laws for mandatory registration of sex offenders and corresponding community notification." (Smith v. Doe (2003)538 U.S. 84, 89 [123 S.Ct. 1140, 155 L.Ed.2d 164]; see alsoFredenburg v. City of Fremont (2004) 119 Cal.App.4th 408.)
[2] All references hereafter to the Penal Code are by section number only.
[3] "Paragraph (1)" provides: "A person is authorized to use information disclosed pursuant to this section only to protect a person at risk."