[S. F. No. 17718.   In Bank.   Aug. 30, 1948.]

AUGUST CHELINI, Respondent, v. SILVIO NIERI, Appellant.

J. W. Coleberd, R. A. Rapsey and Richard P. Lyons for Appellant.

Melvin M. Belli, Jonathan H. Rowell, Laurenz Krueger and Howard E. Gawthrop for Respondent.

SCHAUER, J.—Defendant appeals from a judgment entered pursuant to a verdict which awards plaintiff "$10,000.00 for general damages, and $900.00 for exemplary damages." The award of so-called "general damages" is predicated on defendant mortician's breach of a contract to preserve the body of plaintiff's mother and on plaintiff's physical illness, suffering and disability resulting from his discovery that because of such breach of contract the body became a "rotted, decomposed and insect and worm infested mass." Recovery of such damages is proper under the rule, laid down in *Westervelt* v. *McCullough* (1924), 68 Cal.App. 198, 208-209 [228 P. 734], and included in the instructions to the jury,

that "Whenever the terms of a contract relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties, or the subject matter of which is such as directly to affect or move the affection, self-esteem, or tender feelings of that party, he may recover damages for physical suffering or illness proximately caused by its breach." As will appear from the subsequent discussion, no prejudicial error contributed to the award of damages for physical illness. The award of exemplary damages, however, cannot be sustained because, by an instruction hereinafter quoted, the jury were erroneously told that they could award such damages if they found merely "wilful" breach of contract, whereas it is the settled law of this state that such damages can be awarded only "for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294.)

From the evidence most favorable to plaintiff the following appears: On December 11, 1943, plaintiff's mother died. Plaintiff employed defendant, who was a friend of plaintiff and a mortician, to prepare the body for burial. Defendant orally agreed to embalm the body so that it would "keep almost forever" and to provide a hermetically sealed casket. Plaintiff repeatedly informed defendant that he wished "to have his mother's body preserved, because she had a horror . . . of bugs and water," and defendant repeatedly assured plaintiff that "it would last almost forever." On December 12, 1943, plaintiff selected from defendant's stock a metal casket concerning which defendant said, "it was a bronze casket, and was a hermetically sealed casket, and . . . that is the finest thing that is made . . . 'this is pre-war stuff.' " Plaintiff was grief-stricken and therefore did not in his examination of the casket observe whether it was so constructed that it could be hermetically sealed, but relied on defendant's representation. Plaintiff agreed to and did pay $875 for the casket, embalming, and funeral. Plaintiff further informed defendant that "after the war" he intended to construct a lead box, place the casket therein, have a family vault erected, and move the body to such vault. Defendant agreed that at the time the body was moved to the proposed family vault he would place a ring on the finger and slippers on the feet, and plaintiff paid defendant an additional $25 in consideration of defendant's agreement to perform these services.

Thus defendant knew, at or about the time he agreed to preserve the body "almost forever," that plaintiff was highly

preoccupied with the importance of such preservation and that at some indefinite future date plaintiff intended to move the casket and expected the body to be in such a state of preservation that defendant could place a ring and slippers on it.

There is evidence which tends to show that defendant, when he made the agreement, further knew that it would be substantially impossible of performance. He testified that at that time he "didn't have any [hermetically sealed caskets] in stock," and he "knew that we could preserve the body for a time but not indefinitely." Also there is expert testimony that it is not possible to give any assurance whatsoever as to the length of time an embalmed body will remain in a state of preservation until the embalming has been completed. Defendant, however, assured plaintiff even before embalming was commenced that the body would "keep almost forever."

An employe of defendant, Howard Johnson, embalmed the body. Defendant did not tell Johnson of any special agreement or give him any special instructions with reference to this body. Johnson testified that he would not have been able to guarantee that the body, as embalmed by him in the manner customarily used by competent embalmers in this state, would remain preserved for any length of time.

From December 12 to December 16, 1943, the body was displayed in plaintiff's living room. On December 16, it was placed in a temporary receiving vault at Cypress Lawn Memorial Park. Thereafter, plaintiff visited the vault frequently, sometimes as often as four or five times a week. About two months after the body had been placed there, he observed "a lot of ants walking around there, and quite a few moths there, and I didn't like the looks of that." This condition continued. On about four occasions plaintiff told defendant, "I don't like the looks of these ants," and on each occasion defendant said, "Don't worry about that, your mother is hermetically sealed . . . She will last practically forever." In July, 1945, there were "more ants than ever, and there is a lot of hideous little black bugs jumping around." On July 13, 1945, at plaintiff's request, an employe of the cemetery opened the vault in plaintiff's presence. The casket was covered with cobwebs and insects. Plaintiff went to defendant and told him that the next day at plaintiff's request the casket was to be opened. Defendant assured plaintiff that the body would be "just as perfect as the day we put her in

there . . . She might have a little mold on her, on her hands.'' Defendant said that he would go to the cemetery to view the remains. The next morning plaintiff, his wife, his physician, Dr. Young, and cemetery employes met at the vault. Defendant sent his employe Johnson in his stead. The casket was opened and it was discovered that the flesh of the body had disintegrated and the skeleton was covered with insects.

That night plaintiff awakened with ''a terrible pressure on me.'' He arose, attempted to get a drink of water, suffered a cerebral spasm and fell to the floor unconscious. As a result of the fall plaintiff's face and arms were cut and bruised. The next day plaintiff went to his physician, Dr. Young. The doctor found that plaintiff's blood pressure was abnormally high, prescribed a diet and medicine, and told plaintiff to ''stay in bed and rest, and stop his work . . . —if he did it must be very light work.'' Since he viewed the decomposed body plaintiff can work for only 15 minutes to half an hour without rest; he frequently feels faint; his blood pressure remains abnormally high. Plaintiff had previously felt well, worked sometimes for himself and sometimes for others, and ''could do the work of any two men.''

According to the testimony of plaintiff's physician, an emotional shock cannot cause permanent high blood pressure but it can ''aggravate'' and ''accentuate'' the condition of one so afflicted, particularly in the case of one, such as plaintiff, who ''is a hyperthyroid type''; temporarily ''high blood pressure that is incident to shock, and also what you call cerebral spasm . . . leaves some impairment [of the circulatory system].''

■ Defendant complains of a variance between the cause of action proved and the cause of action alleged. According to the complaint defendant's agreement was simply to embalm the body of plaintiff's mother ''in a good and workmanlike manner'' and to supply ''a metal casket, and all services and every thing necessary . . . for properly depositing said remains in a crypt in Cypress Lawn Memorial Park.'' The complaint does not allege the contract to which plaintiff testified; i. e., to preserve the body ''almost forever'' and to place it in a hermetically sealed casket. But defendant does not attempt to show, nor does it appear, that this variance in any way prejudiced defendant.

Immediately before the taking of evidence began, the plaintiff moved to amend his complaint by adding to his allegation that defendant performed the alleged services and supplied

the alleged materials "negligently," the words "and wilfully." This motion was granted. As hereinafter shown, this amendment did not have the effect for which plaintiff contends; i. e., it did not result in the statement of a cause of action for which exemplary damages could be awarded. But in the course of argument on the motion it became apparent that plaintiff, although he did not ask leave to amend his complaint in such respect, proposed to attempt to prove the contract to which he thereafter testified, rather than the contract which he had pleaded. One of plaintiff's counsel, during such argument, said, "it has developed in the depositions and here, that the Defendant is maintaining that it was impossible to perform the contract, that he represented that he could perform. At the time he was engaged by the plaintiff in this case he was asked to perform a job of embalming which would preserve that woman's body almost forever, and now his position is that it was impossible to do that, and, nevertheless, the defendant represented and agreed that he would do that." Another of plaintiff's counsel stated, "if this is a case where there was a special contract to embalm this body so that it could be moved later on and the defendants knew they did not do it, and that is the proof, then, there would certainly be wilfulness in making the contract."

Thereafter, when plaintiff first testified that he told defendant, "I wanted a hermetically sealed casket, because——," defendant's counsel interposed, "I object to that testimony, on the ground that there is no allegation in the complaint to the effect that there was to be a hermetically sealed casket." The objection was overruled. Defendant made no claim that he was surprised. He did not object to plaintiff's evidence that he agreed to preserve the body "almost forever." Indeed, during the course of the trial he made no further reference to the question of variance between the case developed and that alleged. Defendant by his evidence fully contested the case made out by plaintiff. He testified that he did not agree to supply a hermetically sealed casket and that he made no agreement or representation as to the length of time during which the body would remain in a state of preservation; he denied that plaintiff, at the time defendant undertook to embalm the body, made any statement as to the length of time it should be preserved or as to the mother's horror and fear that "bugs would get at her"; he produced other undertakers to testify that a funeral director of defendant's ability and experience

would not state that a body could be so embalmed that it would keep "almost forever" in a vault.

If, as defendant now urges, he was of the view that allegations of the complaint as to the terms of the contract were "unproved, not in some particular or particulars only, but in [their] general scope and meaning" so as to constitute "a failure of proof" (Code Civ. Proc., § 471), then defendant could have moved the trial court to dismiss the action. (Code Civ. Proc., § 581, par. 5, as it read at the time of trial [Stats. 1935, p. 1954].) The defendant made no such motion, nor did he move for a new trial. In these circumstances we are satisfied that the matter is covered by section 469* of the Code of Civil Procedure and that defendant cannot prevail on appeal by advancing the technical objection, unsupported by any claim of prejudice, that the terms of the contract which during the trial were treated by both parties as being in issue, are not the terms alleged in the complaint. ■ It has been repeatedly held that the question whether a variance between pleading and proof in a given case is material must be determined from the circumstances (see 21 Cal.Jur 265, and cases cited) and that a variance is immaterial and may be disregarded where the case was as fully and fairly tried upon the merits as though the variance had not existed (*Grossetti* v. *Sweasey* (1917), 176 Cal. 793, 795 [169 P. 687]; *Martin* v. *Pacific Gas & Electric Co.* (1928), 203 Cal. 291, 298 [264 P. 246]; see also cases cited in 9 Cal.Jur. 10-Yr. Supp. § 184, pp. 267, 268).

■ Section 3294 of the Civil Code creates the right to recover exemplary damages. The section provides, "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." It has long been settled that "Under this section exemplary damages may not be recovered in an action based upon a contractual obligation even though the breach of contract is wilful or malicious. [Citations.] If on the other hand the action is one in tort, exemplary damages may be recovered upon a proper showing of malice, fraud or oppression even though the tort incidentally

---

*Code of Civ. Proc., § 469. "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. . . ."

involves a breach of contract. [Citations.]'' (*Haigler* v. *Donnelly* (1941), 18 Cal.2d 674, 680 [117 P.2d 331].)

The above-recited evidence, viewed most favorable to plaintiff, would permit the conclusion that defendant was guilty of the tort of deceit; i.e., that defendant intended to and did induce plaintiff to employ* him by making promises which he did not intend to (since he knew he could not) perform and that plaintiff justifiably relied upon such promises and believed that they had been performed, to his damage. (See 12 Cal.Jur. 724, stating the elements of actionable fraud; that a false promise may be a fraudulent representation, see Civ. Code, § 1710, subd. 4, § 1572, subd. 4; *Union F. M.* v. *Southern Cal. F. M.* (1938), 10 Cal.2d 671, 676 [76 P.2d 503]; cases cited in 12 Cal.Jur. 738-740.) Had this action been based upon fraud, exemplary damages might have been allowed even though the operative facts amounted also to a breach of contract. (*Thompson* v. *Modern School etc.* (1920), 183 Cal. 112, 120 [190 P. 451].) But the cause of action pleaded and presented to the triers of fact, upon any reasonable construction thereof of which defendant can be said to have had notice, was based only on contract. The jury were instructed that ''if you find . . . that the defendant Nieri's actions or omissions . . . were wilful, that is, intentionally and knowingly wrongful, you may assess a further sum by way of punitive damages . . .'' but no issue on the theory of the tort of deceit as the basis for compensatory damages, and, hence, punitive also, was submitted to the jury. Under the instructions they were permitted to award exemplary damages if they found merely that any ''actions or omissions'' of defendant in relation to performance or breach of the contract proved were ''wilful, that is, intentionally and knowingly wrongful,'' even though they found that defendant was guilty of no tortious ground of action and no ''oppression, fraud, or malice.'' Therefore, and particularly in view of the fact that on the evidence the jury may well have believed that defendant's representations, although knowingly false, were motivated by friendship or compassion for plaintiff and a desire to comfort him, the award of exemplary damages cannot stand.

Plaintiff concedes that ''the item exemplary damages alone could by this court be stricken from the judgment allowing

---

*A jury could also, of course, take a more charitable view of the motive of defendant's representations and find that they were made for the purpose of comforting plaintiff.

only the general damages to stand''; he states also that ''It is further our contention that the Supreme Court may easily strike the severable $900 exemplary damages if they are *not* allowable and affirm the trial judge of the Westervelt aspects of this case.'' In view of such concession and contention it is unnecessary to consider whether we should otherwise be required to reverse the entire judgment because of the error affecting the exemplary award.

For the reasons above stated, the judgment is modified by striking therefrom that portion which provides that plaintiff recover of defendant $900 for exemplary damages and, as so modified, is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied September 27, 1948.