Filed 12/12/13  In re E.B. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re E.B., et al., Persons Coming Under the Juvenile Court Law. | B246465<br>(Los Angeles County<br>Super. Ct. No. CK89615) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ERIC B.,<br><br>　　　　Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  (Retired Judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————

A dependency matter went to trial based on a petition alleging the father had failed to comply with his court-ordered service plan. After the close of evidence, the juvenile court amended the petition to state, not that father failed to satisfy the requirements of the court-ordered programs, but that he failed to benefit from those programs. The court sustained the petition, as amended, terminated jurisdiction and issued a family law custody and visitation orders. The father contends he was deprived of notice and the opportunity to be heard as to the belatedly amended allegations. We agree.

### FACTUAL AND PROCEDURAL BACKGROUND

In August 2011, appellant Eric B. (Father) and his ex-wife, Dulce C. (Mother) were involved in a family law dispute over custody of their children, then 16-year-old E.B., 12-year-old R.B., eight-year-old T.B. and four-year-old J.B. On August 31, 2011, E.B. and his siblings were visiting Father at their paternal grandparents' home (where Father lived). According to E.B.'s version of events, Father came into the room during a break in a game of pool E.B. was playing with R.B. Father began wrestling with E.B. and put him in a "head lock." E.B. pushed Father away and asked him to stop. Father became upset, wrestled his son to the ground and began choking him; E.B. was unable to breathe. E.B. was able to get away and get up, but Father pushed his chest against the wall and, using his forearm, resumed choking him and wrestled him again to the ground. E.B. tried to hit Father with a pool cue to get Father to stop choking him. Eventually, E.B.'s grandparents were able to separate Father and E.B. E.B. went outside and called the police. E.B. sustained a small (one-inch) abrasion above one eye, a four-inch bruise on his back and complained of back and neck pain.

Father's recollection of the incident differed significantly from E.B.'s. He told the police and respondent Department of Children and Family Services (DCFS) his son had been the aggressor. He and E.B. had been wrestling, as they often did, when E.B. became angry and started hitting and cursing at Father. He got behind E.B. and tried to restrain him by holding his arms against his body, but E.B. resisted. Later, E.B. approached Father and pushed him, the two fell to the floor and E.B. tried to kick Father. Grandfather came into the room at that point and pulled Father away from E.B. The grandparents told the police Father

2

and E.B. appeared to have been playing. Father denied ever physically abusing any of the children. Father claimed the incident with E.B. was a set-up by Mother so he would be unable to see his children and have to pay more child support.

The other children's recollections of the incident tracked E.B.'s. R.B. said she found Father and E.B. "'fighting and rolling around on the floor" when she returned from the restroom. The two were "not playing, 'they were serious.'" Father had E.B. around the neck; it looked like E.B. couldn't breathe and Father hit E.B. with his fist. Father continued to choke E.B., even after E.B. hit Father with a pool cue. R.B. cried and she and her grandparents yelled at Father to get off of E.B. He refused. Eventually the grandparents were able to pull Father off of E.B. who ran out. T.B. witnessed a confrontation in which Father was the aggressor. He first wrestled E.B. to the ground in a choke hold, hitting him with his fist, and then pushed him into the wall choking him. The two "'weren't playing they were serious.'" She and R.B. cried and yelled at Father and tried unsuccessfully to get him away from E.B. They were afraid for their brother. J.B. was also afraid during Father's confrontation with E.B.

The younger children told DCFS they all feared Father. R.B. said she was afraid of Father and did not feel safe with him. He angered easily and, when angry, yelled at and hit her and her siblings. In the past Father had used a belt to hit her on the legs, and he "hits [the children] all over" with an open hand and, sometimes, a belt. T.B. also reported that she was afraid of and felt unsafe with Father who was mean and easily angered. T.B. was afraid Father would do to her what he had done to E.B. J.B. told the DCFS social worker that Father was "mean," and spanked the children on their hands and arms. None of the children, Mother or the grandparents ever saw Father hit J.B., who was born after the parents began living apart.

Mother told DCFS E.B. had a lot of anger against Father, stemming from having witnessed Father's acts of domestic violence against Mother when they lived together. Both parents described their past relationship as volatile and abusive. Each accused the other of being the physical aggressor and of being jealous. Mother said Father raped her numerous times during their relationship, and served a prison term for felony spousal abuse. She feared

3

for E.B.'s safety because Father had physically abused him and R.B. in the past. Mother and R.B. told DCFS that Father refused to feed the children during visits; he told them it was Mother's responsibility to feed them because he paid her child support. DCFS observed that both parents chose to dwell on their abusive relationship with one another rather than focusing on the children's needs or emotions.

In early September 2011, DCFS filed a petition, pursuant to Welfare and Institutions Code section 300.[1] As ultimately amended the petition alleged that on one occasion in late August 2011, Father had "acted inappropriately by striking [E.B.] and pushing the child against the wall," causing E.B. to sustain a bruised back. The petition further alleged that Father's conduct endangered E.B.'s physical health and safety, and placed his siblings at risk of physical harm, damage, danger and physical abuse. (§ 300, subd. (b).) Additional allegations of risk to the children and Father's physical abuse of E.B., R.B. and J.B. under section 300, subdivisions (a), (b), (i) and (j) were later dismissed.

The juvenile court detained the children from Father's custody and gave him monitored visitation with R.B., T.B. and J.B., and ordered that visits with E.B. take place in a therapeutic setting. E.B. (who is now over 18) persistently refused to see Father. R.B. and T.B. also expressed a desire not to have visits with father; they feared him and his uncontrolled anger. When Father did have monitored visits with R.B., T.B. and J.B., the visits went poorly. None of the children wanted to see him. On one occasion, J.B. had to be physically forced to enter the room with Father, and then cried the whole visit. All three children cried during visits, and begged to leave to sit with Mother who awaited them in the lobby. DCFS recommended the visits take place in a therapeutic setting, or in court. Each parent blamed the other "for all the problems."

On January 30, 2012, the section 300 petition was sustained as amended. The court ordered that the children remain in the home in Mother's care. Pursuant to section 360,

---

[1] Further statutory references are to the Welfare and Institutions Code.

subdivision (b),[2] the juvenile court ordered DCFS to provide services to the family, including individual counseling for the children, referrals for Father to anger management counseling and joint counseling for Father and the children. The court ordered that Father's visits take place only in counseling sessions or another therapeutic setting. Joint counseling sessions with Father and the three youngest children should begin forthwith, and sessions with E.B. were to begin when he was ready.

Progress hearings were conducted on April 30 and June 11, 2012. Angineh Pitross, the therapist conducting the conjoint family therapy sessions, informed DCFS that, as of mid-April, Father, R.B., T.B. and J.B had participated in three joint counseling sessions, each of which had been "extremely difficult." None of the sessions was completed because the children acted out and wanted to leave. Pitross told the Certified Social Worker (CSW) the children became "extremely stressed" in Father's presence. After each session, Pitross had excused Father and then conducted debriefing and relaxation exercises to help alleviate the children's anxiety. Pitross opined that, like Father's prior visits with the children at DCFS's offices, the therapeutic visits were "stressful and unproductive." The CSW also informed the court that, as of April 24, 2012, she did not know whether Father had enrolled in an anger management program. Pitross also opined that Father "lacked insight on and [was] unable to take responsibility for alleged negative interactions with children," and "minimizes the impact of alleged actions on" them. No sessions took place after mid-April as Father did not return several calls from Pitross.

In a report for the June 1, 2012 progress hearing, DCFS said Father told the CSW he had been attending weekly anger management classes at the library in the City of Walnut for six months. He did not know the name or phone number of the program or the surname of

---

[2] That statute provides: "If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."

Nancy, the instructor. He also told the CSW he had not obtained any progress reports or proof of participation in the program, but said he could do so. In her June 11, 2012 report, the CSW stated that, "until verified, it appears father is not enrolled in a class as it would seem if he has been attending classes for six months as he claims, he would know the name of the facility and have provided his attorney some proof." On June 11, 2012, Father provided DCFS a June 4, 2012 letter from therapist Nancy Stoops indicating that he was part of her "Monday evening group working on anger management."

The CSW followed up with Stoops on June 11. Stoops said Father had attended her weekly support group between November 7, 2011 and June 4, 2012, and had received a certificate of completion after 10 sessions. Stoops informed the CSW that her group was not an "actual class" but a men's support group focused on issues related to parenting, substance abuse, effective communication and anger management. Stoops also said that, although she was not aware of the details of this case, she did not view Father as an angry man. On the contrary, Father was a "very nice man" who brought cupcakes on her birthday and a "real gentleman" who once escorted her to her car to ensure her safety after another man got verbally aggressive. Father actively participated in group discussions, and Stoops had observed positive behavioral changes and less irritation in him by the end of the sessions.

In her report, the CSW stated that, notwithstanding his months of attendance at Stoops's group, Father "did not complete the anger management class the court ordered him to do." She concluded that "[b]ecause father did not comply with the court ordered anger management class and conjoint counseling sessions with the children," and because his sporadic therapy sessions with the children had not gone well, the court should not dismiss the sustained petition. DCFS recommended that the court terminate jurisdiction in the matter and issue a family law order giving Mother legal and physical custody of the children, and monitored visitation for Father.

On July 30, 2012, DCFS filed the operative petition pursuant to section 360, subdivision (c). Though the court had previously sustained a section 300 petition, DCFS claimed the prior disposition was ineffective in ameliorating the circumstances necessitating DCFS intervention in that Father had "failed to complete the court ordered anger

6

management class and conjoint counseling with the children," and his failure to do so posed a continuing risk to the children. During the hearing, Father's counsel informed the court that the CSW had been aware of and had approved the anger management program Father completed. Father's counsel also stated that Father had attended joint counseling sessions, but that the children refused to participate. Father submitted a certificate dated July 20, 2012, reflecting successful completion of 10 sessions of anger management with Stoops's family support group. The court scheduled a "continued disposition" hearing, and ordered that joint counseling sessions recommence once the children's therapist agreed.

In early October 2012, the therapist conducting the family therapy sessions reported that Father, R.B., T.B. and J.B. had participated in nine sessions between September and March 2012, and that Father missed two sessions. None of the children had actively participated in the therapy and during sessions each had exhibited difficulty communicating with Father, had been unresponsive to his questions and had failed to maintain eye contact with him. Each child had to take breaks during the hour-long sessions. R.B. left at least one session in tears and refused to return. The children had expressed to Father their fear of him and his past behaviors. Pitross opined that Father "continue[d] to have a difficult time responding or helping lower their anxiety," and had "limited insight with regard to the emotions expressed by his children." Pitross also believed Father was "unable to take responsibility for [the] alleged negative interactions with [his] children," and had "difficulty following [her] instructions," such as waiting for [the] children to initiate hug, kiss, etc." She recommended that the family, which had not yet met its goals, continue family therapy. J.B.'s individual therapist told DCFS the child had made minimal progress in parent/child and family therapy, and continued to experience symptoms of anxiety towards, and fear of, Father. The child's symptoms became heightened before, during, and after family therapy sessions with Father. J.B.'s therapist believed it would be best if the child's sessions with Father be discontinued.

The contested disposition hearing was continued several times between October and December 2012. In November 2012, DCFS reported that Mother had exhausted family preservation services. Father had participated in nine sessions with the three youngest

children between mid-March and early November 2012. Pitross recommended family therapy sessions be terminated because they were "causing the children stress and anxiety." The agency recommended that the juvenile court terminate the matter with a family law order granting Mother full legal and physical custody of the children and monitored visitation for Father.

Information and updates submitted on behalf of the children and their therapists between October and December 2012, reflected no significant changes. J.B. still experienced fear of and anxiety toward Father, as a result of witnessing domestic violence between Father and J.B.'s sibling, and fear of harm to Mother and his family members. His therapist recommended that his individual counseling continue, but that family therapy sessions be terminated. E.B.'s therapist reported that he had made significant progress in individual counseling sessions. But he persistently refused to have any contact with Father or to participate in family therapy sessions, due to the emotional difficulty of doing so.

In letters to the court R.B. and T.B. expressed their desire to end their visits with Father. R.B. had difficulty sleeping and experienced nightmares and headaches. Whenever Father entered a family therapy session, she began shaking and felt like crying; these symptoms worsened over time. R.B.'s therapist said the child continued to struggle with significant anxiety related to Father. R.B. was afraid to attend the family therapy sessions; she believed Father would hurt her or her siblings and that no one could stop him. T.B. had also had increasingly frightening dreams about Father, whom she described as "a really scary dad." T.B.'s therapist told the court the child continued to struggle with anxiety, nightmares and fear for her own and her family's safety.

The disposition hearing was conducted on December 19, 2012. The court received the DCFS reports and the children's and therapists' letters in evidence and heard testimony from Father. Father testified that immediately after the court ordered him to do so, he enrolled in Stoops's anger management program, and told the CSW which program he was attending. He received a certificate of completion after 10 sessions, but continued to attend for six more sessions. When asked what he had gleaned from the course, Father said: "there's so much we learned, I mean, just—you address things, the way you deal with things.

8

The way you intake things. The way you go by what's presented to you. A lot of behavior issues. We covered so many basics." Father said if he and E.B. ever had another confrontation he would walk away. Father had been ready to attend joint therapy sessions with the children before March 2012, but was unable to do so because the CSW had not arranged them. He acknowledged missing four sessions. He claimed that the therapist or Mother canceled approximately 12 other sessions, sometimes because the children did not want to participate.

At the conclusion of the hearing, the court said its inclination was to dismiss the petition. It observed that DCFS had not satisfied its burden to show that "these things are Father's fault and that's what the 360(b) [petition] sounds like." The court also took issue with the framing of the petition which made "it sound as if the Father is the reason we haven't had . . . successful . . . sessions of conjoint therapy, and it's not true." The court noted that Father had completed the anger management and counseling programs. It opined that the problem was not that Father had not participated in or failed to complete court-ordered programs, but that he had not benefitted at all from them, nor had he learned to change his behavior as the court had hoped he would.

But the court did not dismiss the petition. Instead, at the suggestion of counsel for the children and Mother, and over Father's objections, the court amended the petition to conform to proof to state: "On 01/30/2012, the court sustained a petition under . . . § 300 (b) in the above captioned matter. The Disposition pursuant to . . . § 360 (b) has been ineffective in ameliorating the situation . . . in that, the father . . . *has failed to benefit from anger management and conjoint counseling with the children* . . . . The father's failure to *benefit from* his programs endangers the children's physical health and safety and places the children at risk of physical harm, damage and danger." (Amendments italicized.) After sustaining the amended petition, the court proceeded to disposition and terminated the case with a family law order granting Mother full legal and physical custody and monitored visits for Father. Father appeals.

9

*1.    Due process violation*

Father contends his due process rights were violated by the juvenile court's amendment of the allegations of the petition after the close of evidence.  He maintains he would have presented a significantly different defense had it been alleged before trial that he *failed to benefit* from the anger management program and family therapy sessions, rather than merely that he *failed to complete or attend* those programs.[3]  We agree.

In juvenile dependency proceedings amendments to conform to proof are generally permitted and, indeed, are favored.  (*In re Andrew L.* (2011) 192 Cal.App.4th 683, 688–689; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1042 (*Jessica C.*).)  But an amendment to conform to proof should not be allowed if it raises new issues which the adverse party had no opportunity to defend.  (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; see also *Jessica C.*, at p. 1042 [an amendment should not be allowed if "the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice."].)  "'If a variance between pleading and proof . . . is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment.'" (*In re Andrew L.*, at p. 689.)  Where such an amendment is proposed, the court should, before allowing it, permit the adverse party to introduce evidence on the new issues.  (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1212, pp. 645–646.)  Otherwise, it "is error . . . to allow the amendment and render judgment without a further hearing."  (*Id*. at p. 646.)  Whether a variance is material is determined from the circumstances of the case.  (*Chelini v. Nieri* (1948) 32 Cal.2d 480, 486.)

A parent's interest "in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity

---

[3] There is no merit to DCFS's contention that Father forfeited this assertion by failing to object.  Father's counsel clearly objected to the juvenile court's belated amendments.

10

to be heard." (*In re B.G.* (1974) 11 Cal.3d 679, 688–689.) This fundamental right "has little, if any, value unless the parent is advised of the nature of the hearing giving rise to that opportunity, including what will be decided therein." (*In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1424, italics omitted.) "Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process. [Citations.]" (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397.) "Notice of the specific facts upon which the petition is based is necessary to enable the parties to properly meet the charges." (*Ibid.*) Procedural due process requires notice and an opportunity to be heard before the government can deprive a person of a protected life, liberty or property interest. (See *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 368, 377.) Notice at the time of the hearing on the merits is insufficient; the parent is entitled to notice, in writing, "of the specific charge or factual allegations to be considered at the hearing" and "at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation." (*In re Gault* (1967) 387 U.S. 1, 33 [87 S.Ct. 1928, 18 L.Ed.2d 527].)

An example used in *Jessica C.* illustrates this concept: "[S]uppose a petition only alleges, under subdivision (d) of section 300, a variety of specific sexual acts perpetrated by a parent, but the trial judge does not find these are true. The county then attempts to amend the petition to allege serious *emotional* damage under subdivision (c) of section 300, based on the idea that any child who would make such allegations, even if false, has obviously been subject to emotional abuse. Such a tactic would be nothing more than a cheap way to establish dependency without giving the parent adequate notice of dependency jurisdiction under an emotional abuse theory." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1042, fn. 14.)

What occurred here is similar to what took place in *Jessica C.* As of July 30, 2012, the subsequent petition alleged that Father had failed to complete the court-ordered program of anger management classes and conjoint therapy with his children. Having found those allegations not true, the juvenile court (rather than DCFS) chose to recast them to allege that Father had not benefitted from the classes taken or joint therapy in which he participated. The court's conversion here of an objectively disprovable allegation, regarding the fact of attendance and participation into a failure adequately to inculcate lessons from those classes

11

and therapy, is tantamount to "nothing more than a cheap way to establish dependency without giving the parent[s] adequate notice of dependency jurisdiction." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1042, fn. 14.)

The allegations in the operative petition concerned a specific failure to act by Father, the disproof of which was wholly dependent on objective evidence that he either did or did not attend the court-ordered classes and counseling. Father's successful defense of that allegation was based on evidence demonstrating that he had attended the classes and made every effort to attend and participate in the conjoint family therapy sessions, and that the DCFS social worker had known about and approved the course he chose to attend. Had Father received adequate notice of a new allegation that he had failed to adequately absorb the lessons and training from the classes and counseling, he undoubtedly would have presented a far different defense. He would likely have cross-examined therapists regarding their expressed opinions as to the benefits of family counseling for the children, cross-examined the CSW who prepared DCFS's reports, presented testimony by Stoops regarding positive changes in his behavior and progress made in her course, and/or examined the children regarding their relationship with him and to shore up his theory that his efforts to repair that relationship had been sabotaged by Mother.

Ordinarily, a court's amendment of a petition to conform to proof is reviewed for an abuse of discretion. (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1043; *In re Man J.* (1983) 149 Cal.App.3d 475, 481.) In this case, however, the variance between pleading and proof was so wide that the court's fashioning a new allegation to conform to proof, without giving Father prior notice or an opportunity to defend, violated Father's right of due process. (*In re J.T.* (1974) 40 Cal.App.3d 633, 639–640.)

"In dependency proceedings, due process violations have been held subject to the harmless beyond a reasonable doubt standard of prejudice." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 193; *In re J.H.* (2007) 158 Cal.App.4th 174, 183.) On this record, we cannot conclude the error was harmless. We cannot speculate as to what specific evidence Father might have submitted or what defense he might have raised had he received adequate notice of a claimed failure to benefit from the court-ordered services. (See *In re Jessica G.*

12

(2001) 93 Cal.App.4th 1180, 1189; *In re Sara D*. (2001) 87 Cal.App.4th 661, 673.) DCFS has not shown that the juvenile court's error was harmless beyond a reasonable doubt.

As we find the violation of Father's due process rights was not harmless beyond a reasonable doubt and requires reversal, we need not consider whether there was sufficient evidence to support the juvenile court's conclusion that Father failed to benefit from the anger management and conjoint counseling with the children.

2.      *Family court is the appropriate forum*

The parties and we agree this is a custody dispute that belongs in family court. The proper course, therefore, is to remand the matter to family court. (*In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1096.) "The family court, rather than the juvenile court, is the proper forum for adjudicating child custody disputes. (*Ibid*.) "The juvenile courts must not become a battleground by which family law war is waged by other means." (*In re John W*. (1996) 41 Cal.App.4th 961, 975.) Any remaining issues should be litigated in family court.

### DISPOSITION

The order of the juvenile court is reversed. The matter is remanded to the juvenile court with directions to dismiss the petition. Further proceedings on custody and visitation shall be conducted in the family court.

NOT TO BE PUBLISHED.


                                                    JOHNSON, J.


We concur:


        ROTHSCHILD, Acting P. J.


        CHANEY, J.

13